135 So.2d 570 (1961)
Floyd M. MILLER
v.
STATE DEPARTMENT OF HEALTH.
No. 5248.
Court of Appeal of Louisiana, First Circuit.
November 20, 1961.
Rehearing Denied December 27, 1961.
Certiorari Denied February 2, 1962.
*571 Hugh M. Ward, Shreveport, for appellant.
Ingard O. Johannesen, New Orleans, for appellee.
Before ELLIS and HERGET JJ., and MILLER, J. pro tem.
MILLER, Judge pro tem.
This is an appeal from a decision of the Civil Service Commission sustaining the dismissal of appellant, Floyd M. Miller, classified under the Civil Service of Louisiana as Sanitarian III and employed as Chief Sanitarian of the Caddo-Shreveport Health Unit.
The facts of the case as found by the Civil Service Commission and supported by the evidence, are as follows:
"In the summer of 1957, appellant was selected by a national association of sanitarians as corecipient of an award for outstanding scientific service in the field of sanitation, to be presented during the association's proximate convention to be held in Seattle, Washington.
"Appellant, whose monthly take-home pay is about $373.00, did not have the means to afford the trip to Seattle to receive the award. Certain friends and subordinates were eager to afford him that pleasure. Other means for raising the required funds having failed, two of appellant's subordinates proceeded, without informing appellant of their plans to solicit contributions from a local association of restaurant operators and from business establishments subject to inspection and supervision by the Health Unit of which appellant was Chief Sanitarian.
"On or about June 12, 1957, appellant received a check for $120.00 from the Shreveport-Bossier Chapter of the Louisiana Restaurant Association and in addition contributions aggregating $395.00 were made by such establishments by checks payable to the national association. Appellant added his own contribution of $5.00, forwarded the checks to the national association and received and accepted in return the national association check for $400,00.
"Appellant ordered his subordinates to return one $100.00 contribution when he learned of some criticisms relative thereto. He also ordered that all solicitations be stopped but the check was not returned and the solicitations did not stop. Appellant by his own admission received a total of approximately $515.00 contributed by individuals or establishments under his official jurisdiction, but he insists that he was not aware of the identity of the individual contributors, and there is no proof to the contrary, although it is clear that the appellant knew that $120.00 had been contributed by the local chapter of the Louisiana Restaurant Association *572 and the appellant did forward the nine checks from individuals and establishments and his own check for $5.00 to the national association. Many of the contributors testified that their participation was unattended by any hope of gain or fear of reprisal, and that they acted under a sense of civic pride as they considered that the honor bestowed on appellant redounded to the credit of the community.
"Dr. W. J. Sandidge is the Medical Director of the Caddo-Shreveport Health Unit, under joint appointment by the Caddo Parish Board of Health and the State Board of Health; he is Municipal Health officer of the City of Shreveport, under appointment by the Municipal Board of Health with the approval of the State Board of Health, and is Caddo Parish Health Officer under appointment by the Caddo Parish Board of Health, with the approval of the State Board.
"Appellant was an employee of the Caddo-Shreveport Health Unit, headed by Dr. Sandidge, its Medical Director. The latter was expressly authorized by the Caddo Parish Board of Health and by the Shreveport Board of Health to take such disciplinary action relative to appellant as he might deem proper, and the action evidenced by his letter of May 20, 1958, was taken with the approval of the executive officer of the State Board of Health.
"Before appellant's trip to Seattle, in June of 1957, appellant showed Dr. Sandidge the $400 check he had received from the national association and told Dr. Sandidge "that a lot of friends had helped contribute to that cause". Appellant did not identify the friends, did not tell Dr. Sandidge that the friends were all Shreveport residents, and did not explain that the check had been exchanged for other checks totalling $400. Dr. Sandidge had no reason to believe that the $400, or any part of it, had been contributed by individuals or establishments under appellant's control.
"There is no direct evidence to support appellant's charge that his removal was motivated by personal prejudice."
Under the above facts the Commission found that Dr. Sandidge was in fact the "appointing authority." The Commission concluded that the disciplinary action taken against appellant was supported by legal cause, and was not arbitrary, unreasonable, or discriminatory.
Appellant specifies three allegations of error in the decision of the Commission, as follows:
(1) In finding as a matter of law, that W. J. Sandidge, M.D., medical director of the Caddo-Shreveport Health Unit, himself a classified Civil Service employee, was Mr. Miller's appointing authority and therefore vested with the power to discharge appellant under the provisions of La.Const. Art. XIV, Sec. 15.
(2) In finding that there was legal cause, as required under La.Const. Art. XIV, Sec. 15, for Mr. Miller's dismissal.
(3) In exceeding its expressly delegated and defined powers in declaring ad hoc a policy as the basis of its decision, which policy is not promulgated; the said Commission thereby going beyond its expressly delegated powers in reaching the instant decision.
The dismissal of Mr. Miller would have to be set aside if in fact Dr. Sandidge was not appellant's appointing authority, for Article XIV, Section 15(N)(1) of the Louisiana Constitution provides:
"No person in the State or Classified Service, having acquired permanent Civil Service status, shall be demoted, dismissed, or discriminated against, except for cause, expressed in writing by the appointing authority." *573 The requirement that the discharge must come from the appointing authority is to be strictly construed. This strict construction is indicated by the line of cases which have interpreted this same section of the constitution with regard to the requirement that the "cause" be expressed in writing. It has been held that absence of proper notification is fatal to the legality of the employer's action. Young v. Charity Hospital of Louisiana at New Orleans, 226 La. 708, 77 So.2d 13, Day v. Department of Institutions, 228 La. 105, 81 So.2d 826.
Appellant's argument as to this allegation of error may be summarized as follows: That the Caddo-Shreveport Health Unit is a municipal-parish function; that there is no statutory law authorizing the existence of a municipal-parish unit and therefore there is no law naming the "appointing authority" in this instance; that it therefore follows that the "appointing authority" is the Municipal Board of Health representing the City of Shreveport and the Parish Board of Health representing the Parish of Caddo; that these boards cannot delegate their "appointing authority"; that the "appointing authority" cannot be vested in a person who is himself a classified employee under civil service; that in any event, it is well established in this case that Dr. Sandidge could employ personnel only with the consent of the Louisiana Department of Public Health, and therefore Dr. Sandidge alone could not be held to be the appointing authority.
The record shows that the Caddo-Shreveport Health Unit is indeed a unique operation. It is unique in that, as argued by appellant, it is a municipal-parish unit and there is no statutory authority for such a unit nor is there any legislation setting out the "appointing authority" for such a unit. It appears that the Shreveport Board of Health (which operates under the provisions of LSA-R.S. 40:61 through 40:69) and the Caddo Parish Board of Health (which operates under the provisions of LSA-R.S. 40:41 through 40:55) usually meet at the same times, but that separate minutes of the meetings are kept. This is explained by State Exhibit 7 which sets out the minutes of the November 20, 1934 meeting of the Caddo Parish Board of Health and states in part:
"Mayor Caldwell appeared before the Board in the interest of consolidating the Boards of Health of Caddo Parish and the City of Shreveport and stated that according to a ruling from the City Attorney the above mentioned Boards could not merge, but that there was no law prohibiting the two bodies from meeting in the same room at the same time and carrying out the respective orders of business."
It is noted that LSA-R.S. 40:46 provides for the combination of two or more parishes, but this would not authorize a parish-city unit. Since the law does not provide for the existence of a joint municipal-parish Health Unit, we must determine just how the unit has been operated.
Dr. W. J. Sandidge has at all times since 1934 served as Medical Director of the Caddo-Shreveport Health Unit by joint appointment of the Caddo Parish Board of Health and the State Board of Health; he is Municipal Health officer under appointment by the Shreveport Board of Health with the approval of the State Board of Health, and is Caddo Parish Health Officer by virtue of an appointment from the Caddo Parish Board of Health, with the approval of the State Board of Health. The record shows that since Civil Service has been in effect, all employees of the Caddo-Shreveport Health Unit have been employed in the same manner as the appellant. When Dr. Sandidge needs personnel, he gets a list of qualified applicants through the State Department of Health from the Civil Service Commission. Dr. Sandidge then appoints one and sends that name back to the State Department of Public Health for their record purposes. The record does not make it clear as to whether or not the State Department of Public Health can refuse to accept the appointment by Dr. Sandidge, but Dr. Sandidge testified in answer to the question *574 as to where the appointment comes from" I would say it comes from me."
The Caddo-Shreveport Health Unit derives approximately 75% of its operating funds from a three-quarter mill parish wide tax on all property in Caddo Parish. The balance of its funds come from State and Federal appropriations. In addition to these operating funds, the Caddo-Shreveport Health Unit receives a great deal of technical assistance and medicines from the State which would substantially change the percentage of support contributed by the parish tax.
The record makes it abundantly clear that the Shreveport Board of Health takes the position that their relationship to the Caddo-Shreveport Health Unit is limited to policy matters and that they take no part in administrative matters within the Caddo-Shreveport Health Unit. Mayor Gardner, President of the Shreveport Board of Health, testified in essence that
a) employees of the Caddo-Shreveport Health Unit are not supervised by the Shreveport Board of Health,
b) the Shreveport Board of Health was of the opinion that any disciplinary action against Miller should be handled by the Caddo-Shreveport Health Unit through its Director, Dr. Sandidge,
c) the appellant, Floyd M. Miller, was Not an employee of the City of Shreveport or the Shreveport Board of Health and that Miller was Not functioning under the City budget,
d) neither the Shreveport Board of Health nor the City of Shreveport ever exercised any budget powers over the Caddo-Shreveport Health Unit by whom Miller is employed,
e) the City of Shreveport, as such, contributes no tax funds to the operation of the Health Unit; and that the only payment from the City to the Health Unit is for actual labor performed by the Health Unit to cut some ditches for the city.
Mr. George O. Baird testified, as a witness for the appellant, that he is chairman of the Health Committee of the Caddo Parish Police Jury and a member of the Caddo Parish Board of Health; that the police jury committee and the Parish Board of Health were most active in their support of the three-quarter mill parish tax, and in finding the site, working out plans and picking the architect for the recently constructed building which houses the Caddo-Shreveport Health Unit; but that he did not know whether or not the Parish Board of Health had any authority to hire and fire personnel at the Caddo-Shreveport Health Unit. This proves that up until this time, the Parish Board of Health has not operated as the "appointing authority."
Mr. S. C. Newitt, Secretary and ex-officio a member of the Louisiana State Board of Health testified and explained how employees are employed by the Caddo-Shreveport Health Unit. In summary he indicates that Dr. Sandidge would requisition personnel through the State Board of Health. The State Board of Health would in turn determine from the Civil Service Office how many and the names of applicants that were qualified in that field. The Civil Service Office would send this information in the form of a register which would be submitted to the State Board of Health. The State Board of Health would in turn submit several names from the register to Dr. Sandidge for his selection of one of the applicants to be appointed. After Dr. Sandidge appoints the employee the appointment is made known to the New Orleans office of the State Board of Health so that the pay records can be properly handled. When the appointment is approved by the President of the State Board of Health the man becomes an employee of the State Board of Health and of the Caddo-Shreveport Health Unit.
The question as to who has the authority to discharge an employee has been presented for decision, and in the matter of Konen v. New Orleans Police Department, *575 226 La. 739, 77 So.2d 24, at page 27, the Court quoted the following legal holding from Keim v. United States, 177 U.S. 290, 293, 20 S.Ct. 574, 575, 44 L.Ed. 774, 776,
"In the absence of specific provision to the contrary, the power of removal from office is incident to the power of appointment."
The efficacy of this rule can hardly be questioned where, as here, there is no statute authorizing the creation of a unit such as the Caddo-Shreveport Health Unit, or specifically naming the "appointing authority." In following this rule we find that Mr. Miller testified that Dr. Sandidge employed him. The record further shows that Dr. Sandidge employed all of the personnel for that unit in the manner hereinabove set out.
In support of appellant's argument that the "appointing authority" cannot be vested in a person who is himself a classified employee under civil service, appellant cites the evidence that Dr. Sandidge is classified as "Public Health Physician III." Appellant strongly urges that the entire scheme of civil service never intended that one classified employee should have the power of hiring and firing another in the classified service; that when the entirety of Article XIV, Section 15 of the Constitution is considered, one must conclude that it was never intended that the man who does the hiring and firing should himself be protected in a classified position. Appellant argues that the entire scheme of the civil service law is that the "appointing authority" should, and rightly so, be answerable, directly or indirectly, to the electorate.
Appellant has been unable to cite any authority in support of this argument and we know of none. In answer to this argument the Commission ruled that it "is without substance," and cited the civil service amendment to the constitution Article XIV, Sec. 15(F)(1) which provides:
"Directors shall be classified as Civil Service employees and act as administrative heads of their respective departments, shall appoint such employees, experts, special assistants and attorneys, with the consent of the appropriate Commission, as may be necessary * * *."
Appellant argues that it cannot be said that the Director is the "appointing authority" when the Constitution requires the Director to have "the consent of the appropriate Commission." This argument is in effect the same as appellant's contention that Dr. Sandidge cannot be the appointing authority because in practice, after he appointed the employee, the appointment was submitted to the State Board of Public Health for approval by its president.
We believe that the above quotation means that the appointment comes from the party that selects the employee. While it is true that the consent of the appropriate Commission or Board is necessary, it cannot be said that the Commission or Board is the appointing authority. The right to withhold consent of an appointment made by the director, may prevent an appointment, but it cannot, of itself, appoint anyone to the position. There is evidence in the record to the effect that the State Board of Health, through its president, does approve the appointments made by Dr. Sandidge before the employment is made final. But this does not authorize the State Board of Health to employ personnel for the Caddo-Shreveport Health Unit. The appointing authority is the authority that selects the employee and not the body that must consent to the appointment.
In this case, the record makes it abundantly clear that the moving party in these proceedings to discharge Mr. Miller has been the State Board of Public Health, acting through its President, Dr. Rein, and Secretary, Mr. S. C. Newitt. The secretary and ex-officio a member of the Louisiana State Board of Health, testified:
"That letter of dismissal was written with the approval of Dr. Rein, who is President of the State Board of Health. Dr. Rein requested that I come to *576 Shreveport here on May 20 because of an injunction that was gotten out by (Mr. Miller's attorney) against Dr. Sandidge and when we came up and the injunction had been removed, we wrote the letter of dismissal for Dr. Sandidge's signature and he signed it and mailed it off to Mr. Miller."
There can be no question but that the discharge had the approval and consent of the President and Secretary of the State Board of Health.
Since we have concluded that the Caddo Parish Board of Health and the Shreveport Board of Health are not the "appointing authority" in this case, it is not necessary to consider the argument that these two boards cannot delegate this right and duty. In passing, however, it is noted that both of these Boards met to consider this problem on several occasions. On May 9, 1958, after the Shreveport Board of Health declined to take any action concerning Mr. Miller's employment for the reason that they had nothing to do with the administration of the Health Unit, the Caddo Parish Board of Health voted unanimously "to leave to Dr. Sandidge the decision in this Miller case, that he might file charges against Mr. Miller or return him to duty."
It is therefore our conclusion that Dr. Sandidge was the "appointing authority" of Mr. Miller and, if any approval was necessary, that the dismissal had the approval of the State Board of Health, acting through its president and secretary.
Appellant's next allegation of error is that the record fails to show that there was legal cause for the dismissal of Mr. Miller. The burden of proof before the Civil Service Commission is on the employee, Mr. Miller, as set out in the Louisiana Constitution Article XIV, Sec. 15 (N)(1)(a) which provides:
"The burden of proof on appeal, as to the facts, shall be on the employee."
The Commission's finding of fact is final, and the appeal is only on questions of law. Louisiana Constitution Article XIV, Section 15(O)(1). This provision has been interpreted in Konen v. New Orleans Police Department, 226 La. 739, 77 So.2d 24 to mean that the decision of the Commission will not be disturbed where the decision is based on "substantial" evidence. In Mayerhafer v. Department of Police of City of New Orleans, 235 La. 437, 104 So.2d 163, the Supreme Court indicated that they would require some "probative" evidence in the record before the findings of fact of the Commission were found to be final. In the case of Colvin v. Division of Employment Security, La.App., 132 So.2d 909, at 916 this court recognized the rule that
"this Court is without authority to examine the weight and sufficiency of the evidence where there is some evidence to support the finding of the Commission * * *." (citing cases)
We have examined the record and find that it contains substantial and probative evidence to sustain the findings of the Commission. In addition to the summary of facts in the findings by the commission, we will review some of the other facts which the Commission did not see fit to mention in its opinion. Mr. Miller testified that at the time he was first notified that he would receive the Mangold Award, there was a discussion at Miller's home between Miller, Eddie Noland (Sanitarian II under Mr. Miller) and others about the fact that Miller was unable to finance the trip and that maybe the Chamber of Commerce or the State Association of Sanitarians would participate in sending Miller to Seattle to get the award. Both of these possibilities were explored and no money was forthcoming. About 10 days to two weeks later, Noland (now deceased) came into Miller's office one morning and gave him a $120.00 check payable to Miller and made by the president and treasurer of the Shreveport-Bossier Chapter of the Louisiana Restaurant Association. On the check was the notation "For Travel Expenses." Concerning this check, Mr. Miller testified "* * * so I held the check for a couple *577 of days because of the possibility there, I woundered about the face of the check and finally deposited it in the Commercial National Bank and told Eddie (Noland) if there were any objections, to find out if there were any objections to the use of the check for my trip to Seattle and he finally told me there were no objections." About nine days later Mr. Miller overheard "John Cox popping off that Eddie Alias had made a statement that he had paid off and he wanted to know why they were inspecting his establishment." Miller then and there called in Cox, Noland and Fulco (John R. Fulco, Sanitarian I under Mr. Noland) and told them "I just heard Mr. Cox make the statement that Eddie Alias had stated that he had paid off and I want that check returned to him immediately, and whatever you are doing, stop now." However, that afternoon or the next afternoon, Noland came in his office. On direct examination Miller reported the conversation as follows Noland said, "I've got a confession to make. I hope you don't feel bad about it because, he said, I've been trying to help you. He said, I have $395.00 in checks to help defray your expenses in addition to the $120.00 that you have collected already, but he said, if you are going to be mad about it, you are going to hurt my feelings. We discussed it and I asked him who the checks were made payable to and he told me there were some made to the National Association and some made to the Awards Committee and I told him that they would have to be sent to the National Office, that I would not touch those checks, that I didn't even want to see them. So he got up and walked out of the office and he came back in about ten or fifteen minutes and asked me would I write the cover letter for it." The cover letter was written by Miller and is on the letterhead of the National Association of Sanitarians and reads as follows:
"Dear Walt,
"Enclosed are $400.00 in checks which includes a personal check from me for $5.00. When I talked to Nick I thought we had $400.00 in checks, but when I checked up we lacked $5.00, so I made up the shortage. I am hoping that Nick has talked to you about this by now, because it would take too long to explain by letter.
"However you are to send me a check for $400.00 and these checks will replace it. We felt it would be better to do it this way because some of the checks are made out to the N. A. Committee. I can assure you though that all of them were intended for me personally.
 "Sincerely,
 "Floyd."
Mr. Miller identified "Nick" as Nick Pohlit, the executive secretary of the National Association of Sanitarians, and testified that
"I called Nick Pohlit after I found out what Eddie had done and suggested that the checks be, at least I suggested that the checks be sent out there and the check be sent back to me from the National. Yes, sir, I did that."
The addressee in the letter "Walt" is W. W. Kimsey who was the treasurer of the National Association. Floyd is Mr. Miller.
While it is a fact which has been found by the Commission that Mr. Miller never knew the identity of the individual contributors to the Travel Expense fund, it is also a fact that Mr. Miller recognized that his subordinates had this information. Mr. Miller could have readily determined from his subordinates whether or not any of the contributions had been made by businesses routinely inspected by the Sanitarians. Had he done this, he would have learned that not one cent was donated by anyone other than the establishments or businesses subject to the inspection of his department.
As to the $120.00 check from the Shreveport Bossier Chapter of the Louisiana Restaurant Association which was payable *578 to Mr. Miller and noted "for travel expenses" there can be no question but that Mr. Miller knew that the contribution was from one or a group of businesses routinely inspected by Sanitarians under his direction. It is to be noted that when this check was received by Mr. Miller, he saw fit to delay cashing it for a couple of days, but he did not demand that his close friend, Eddie Noland, stop right there. It was not until the additional $395.00 had been collected that Miller instructed Noland to stop. This was brought out under cross-examination about the $100.00 check from Eddie Alias which Mr. Miller told Noland to return and which in fact was not returned, but was instead forwarded with the "Dear Walt" letter. This portion of the cross-examination is quoted as follows:
"Q. Do you know whether or not he ever took it back? A. Apparently, he did not.
"Q. Did you tell Mr. Noland to cut that out? A. Yes, sir, I told him right then, I said, I don't know what you are doing, but stop it immediately.
"Q. Why did you tell him to stop collecting this money? A. Because I thought that was sufficient. He told me then, he told me then that he had several hundred dollars and I said, well, you stop whatever you are doing."
It is our view that the "cause" for dismissal was committed by Miller when he, as Chief Sanitarian, accepted travel expense contributions which had been obviously collected by his subordinates, without making absolutely certain that the contributions were from individuals or establishments not subject to the inspections of his subordinates. Throughout the record it is apparent that Mr. Miller recognized that it would be improper for him to know the identity of the donors whose establishments were subject to inspections by his Department. When Miller was informed that Noland "had several hundred dollars," Miller made it clear that he didn't want to know the identity of the donors. Why would it be improper for him to know the names unless the donors were operating businesses which were subject to the inspections of Miller's department. If it was improper for Miller to know the names of the donors, how could he accept donations collected by his subordinates, those that actually make the inspections, knowing full well that these men knew precisely who gave and how much as well as who might have refused to give.
We are in complete agreement with the findings of the Commission that:
"The suggestion that a classified employee may with impunity accept contributions for his private purposes under the circumstances herein disclosed, or under any other circumstance, would countenance a policy inimical to the public interest and offensive to public taste and propriety. The public is entitled to protection against such solicitations, which though said to be unaccompanied with any promise of reward or threat of reprisal, tend to demoralize the public service by creating the suspicion that the contributors would receive preferential treatment at the hands of public servants, whose judgment in the performance of public duties should be free from all possible bias."
Appellant cites the cases of Brickman v. New Orleans Aviation Board, 236 La. 143, 107 So.2d 422, and Cottingham v. Department of Revenue etc., 232 La. 546, 94 So. 2d 662, wherein the Supreme Court stated (at 107 So.2d 428):
"* * * there must be a `real and substantial relation between the assigned cause for the dismissal of appellant (employee) and his qualifications for the position in which he served,' otherwise `the action of the Commission in upholding his removal would, of course, be arbitrary and hence subject to annulment by this court as a *579 matter of law.' An assigned reason for disciplinary action does not of itself provide good cause therefor in the absence of a showing of some relationship between the assigned reason and prejudice to the efficiency of the public service."
We believe that the facts of this case show that there is some direct relation between the acts of the employee, Mr. Miller, and his ability to perform his duties as a civil service employee.
We find no merit to appellant's last contention that there can be no dismissal for the reason that the Caddo-Shreveport Health Unit did not have a properly promulgated policy against employees accepting gifts from the establishments which are inspected by their personnel under the circumstances disclosed in this case. As stated hereinabove, the fact that Mr. Miller made an issue of keeping unknown to himself the identity of the donors indicates that whether or not such a policy was properly promulgated, receiving such funds from inspected establishments was wrong. It was just as wrong to accept travel expenses from inspected establishments when the identity of the donors was well known to his subordinates. These subordinates actually made the inspections and their conduct, insofar as it was concerned with the administration of his office, was appellant's responsibility. He is deemed to know what he should have known.
To allow appellant to escape with a head in the sand defense, would open the gates to a tongue in cheek circumvention of the accepted principle that one charged with regulating businesses cannot accept personal contributions solicited by his subordinates from the regulated businesses. Such a principle is necessary to protect the public from the suggestion of coercion or wrongdoing.
The conclusion here is made most difficult by the practical consideration of appellant's long, faithful and outstanding tenure as a civil servant. However, this court cannot set aside the action of the Commission on the basis that the punishment does not suit the offense. Where the civil servant has erred, as in this case, he is subject to the discipline of his appointing authority. This court is not permitted to decide what punishment should have been imposed, for, as stated hereinabove, we are limited to reviewing the determination of whether or not there is a real and substantial relation between the assigned cause of dismissal and the qualifications for the position. Brickman v. New Orleans Aviation Board, supra, Cottingham v. Department of Revenue, supra.
For these reasons, the ruling of the Commission is affirmed.

On Application for Rehearing
PER CURIAM.
On November 20, 1961, we rendered judgment affirming the ruling of the Civil Service Commission sustaining the dismissal of appellant, Floyd M. Miller. An application for rehearing was filed questioning the judgment for several reasons, one of which was that the "assigned cause" for the dismissal of appellant was the act of accepting money, while the "cause" for dismissal found by this court was in accepting the money without making absolutely certain that its source was from a non-supervised activity. It is therefore contended that the "assigned cause" set forth in the letter of dismissal written by the appointing authority does not meet the requirements that explicit and detailed reasons for the discharge must be furnished the discharged employee in the discharge letter.
The explicit and detailed reasons or "cause" given for appellant's discharge in the instant case are set out in paragraphs numbered (1) and (4) of the discharge letter *580 received by Mr. Miller and read as follows:
"(1) That on or about June, 1957, you received and accepted $120.00, represented by a check dated June 12, 1957, drawn by the Shreveport-Bossier Chapter of the Louisiana Restaurant Association to the order of Awards Committee, National Association of Sanitarians, which sum of money represented a joint contribution by certain businesses over which you and your Health Unit exercised control and supervision, and which money was appropriated and collected for your personal use. The individuals operating said businesses who jointly contributed the money for this check are named as follows: W. I. Grant, Glenn O. Smith, E. O. McNees, J. W. Browning, G. G. Kennedy, Tony Sansone, Augustine Cueller, Murrell Stansel, Louis Bayer, and James Litchford.

* * * * *
"(4) In May or June 1957, you received and accepted a total sum of $395.00 from the following list of individuals and businesses operating in the area over which you and your sanitarians had supervision and control: Four Sisters, Pedro's Rest., Uptown Barbecue, Tilbury's Meat Co., Southern Maid Donut, Foremost Dairies, Midwest Dairy, Foley's Barbecue, and Spot Comm. Club."
The "cause" set forth in paragraph numbered (1) above was proven beyond any doubt. As was noted in our opinion, the June 12th, 1957 check drawn by the Shreveport-Bossier Chapter of the Louisiana Restaurant Association was payable to the order of Floyd Miller, appellant. On the face of the check there appeared the statement that the $120.00 was "for travel expenses". This check was deposited by Mr. Miller to his own bank account.
The statement in our opinion that "the `cause' for dismissal was committed by Miller when he, as Chief Sanitarian, accepted travel expense contributions which had been obviously collected by his subordinates, without making absolutely certain that the contributions were from individuals or establishments not subject to the inspections of his subordinates." was related to the cause set forth in paragraph numbered (4) in the discharge letter.
Since appellant admits that he received and deposited to his own account the $120.00 check for travel expenses from the Shreveport-Bossier Chapter of the Louisiana Restaurant Association, we find it unnecessary to decide whether or not the additional cause set forth in our opinion and cited in the application for rehearing would be allowed as proof of the cause set forth in paragraph numbered (4) of the discharge letter.
The application for rehearing is denied.