LANDRY, Judge.
Plaintiff (Appellant) appeals from judgment of the Civil Service Commission (Commission) affirming Appellant’s dismissal from the classified State Civil Service position of Capitol Area Security Offi *865 cer, effective March 27, 1975, following Appellant’s suspension on March 14, 1975. In affirming the dismissal, the Commission rejected Appellant’s contentions that Appellant was not dismissed by the proper appointing authority and that the grounds assigned for dismissal do not constitute good cause for such disciplinary action as required by the Commission’s rules. We affirm.
Appellant was employed by the Division of State Buildings and Grounds (Employer), a subdivision of the State Division of Administration which, in turn, is a department of the Executive branch of state government under the direct supervision and control of the Governor. By letter dated March 24, 1975, Appellant was discharged by R. N. Rizan, Sr., Superintendent, Division of State Buildings and Grounds. The dismissal, made effective March 27, 1975, listed the following grounds for removal:
“Pursuant to the authority contained in Civil Service Rule 12.3, you are hereby advised that you are being removed from your position as a Capitol Area Security Officer effective 3-27-75, following your suspension on 3-14-75.
The reasons are as follows:
Your continuous gripes, slanderous fiase (sic) accusations, dissatisfaction of your job, attitude toward your Supervisors, degrading the Department and Superintendent, use of profane language, and your referal (sic) to fellow employees as pimps and rats have been deterimental (sic) to the Department and Security Force causing low morale; all as more particularly described below.
On 3-12-75, you submitted two different Union Grievances which were completely out of order, showed poor judgment and contained mostly falsehoods. Copies of your statements are attached hereto and made a part hereof.
These grievances reflected your personal dissatisfaction, slanderous and false accusations toward your Supervisors, Superintendent and the Department.
Since your employment with the department on 10-12-69, your personnel folder shows your Yearly Service Ratings, and Increase Recommendations have notations, of attitude toward your Supervisor and cooperation with others, needed improvement.
Your latest Service Rating dated 4-19-74 —Remarks—You should strive to contain your remarks of dissatisfaction with duty related decisions.
Your increases of 10-21-72, and 10—10— 73, were disapproved and held up because of your attitude, resents authority, gets upset and looses (sic) self control. The following described letters of reprimand and suspension typify your work relationship:
1. A written recommendation concerning your promotion on 4-10-71, to a Capitol Area Security Supervisor I, states that you have the intelligence; but is a griper and fault finder.
2. On 2-16-72—Letter of reprimand on poor performance of duty and bad judgment on two different incidents.
3. On 12-29-72—A letter of suspension and demotion for conduct unbecoming an officer, that could have resulted in a dismissal.
4. In a letter dates September 19, 1973, you again were reprimanded for several incidents where your conduct and job performance was in question.
5. Your loss of self control and threat-ing (sic) a fellow employee resulted in a suspension on September 21, through September 25, 1973.
All the above described actions have consisted of false accusations, poor attitude and other actions lessening your efficiency and the efficiency of the Sécuri-, ty Force. Your actions have greatly *866 damaged the morale of the Security-Force and the entire Department.”
Appellant correctly contends a classified employee in the State Civil Service may be disciplined and/or discharged only by action of his duly delegated appointing authority. Civil Service Rules, Chapter 12, 12.1.
Appointing authority, as defined by the Commission’s rules, means the agency, department, board or commission and the officers and employees thereof authorized by statute or lawfully delegated authority, to make appointments in the State Civil Service. Civil Service Rules, Chapter 1, 1.4.
Our jurisprudence has consistently held that Rule 12.1, above, means that a classified employee must be disciplined and/or discharged by his proper appointing authority. Young v. Charity Hospital of Louisiana at New Orleans, 226 La. 708, 77 So.2d 13; Day v. Department of Institutions, 228 La. 105, 81 So.2d 826; Miller v. State Department of Health, La.App., 135 So.2d 570.
Appellant contends his appointing authority was Charles Roemer II, Director, Division of Administration, or Roemer’s assistant Joseph Terrell. This argument is admittedly premised on the fact that in October, 1973, Terrell discharged Jerry Bennett from the position of Assistant Superintendent, Division of State Buildings and Grounds, and the Commission held in Bennett’s case, Number 1165 on the Commission’s docket, that Roemer was the proper appointing authority. It is contended the Commission reached this conclusion on the basis of Executive Orders 40 and 41, effective July 1, 1973, wherein the Governor delegated Roemer supervisory jurisdiction over Employer, including the right to hire and discharge employees, which authority Roemer delegated to Terrell.
Joseph Terrell, Assistant to Roemer, testified that prior to issuance of Executive Orders 40 and 41, effective July 1, 1973, Employer, as a branch of the Executive Department, was required to report directly to the Governor'. However, Orders 40 and 41 directed Employer and two other state agencies therein named to henceforth report to Roemer as head of the Division of Administration. The mentioned orders, appearing in evidence, so indicate. Terrell also noted that subsequent to July 1, 1973, Roemer, through Terrell, exercised the function of appointing authority for Employer but only for a period sufficiently long to enable the Division of Administration to become thoroughly familiar with all personnel problems in Employer’s department. After sufficient data was obtained, authority to handle Employer’s personnel matters and problems was returned to Ri-zan as Employer’s Superintendent. Terrell acknowledged that the Division of Administration retained “oversight responsibility” in “unusual cases.” He stated the return of authority to Rizan was effective prior to January 1, 1975, and has remained in Rizan continuously since. Lastly, Terrell stated that with the exception of the Bennett case, no appointing authority has been exercised by him over Department employees.
Rizan testified to having been Superintendent of Employer for several years during which time he has exercised the function of appointing authority in every instance except Bennett’s discharge, both prior to and since January 1, 1975. We note the record does not disclose the precise date on which Rizan was authorized to resume the role of appointing authority with respect to employees of Employer. We also note that La.R.S. 49:149, added to our Revised Statutes by Act 156 of 1974, creates the capítol police, the members of which “shall be appointed by the superintendent of state buildings.” Under the circumstances, it suffices to state that the record establishes beyond doubt that Rizan, as Superintendent of State Buildings and Grounds, was the proper appointing authority on the date of Appellant’s discharge.
*867 The record reflects that Appellant is a steward in a local union to which approximately one-half of the Department’s employees belong. It is equally clear that in such capacity Appellant is most zealous in advancing the cause of unionism and securing maximum benefits for members of his union. Equally evident from the record is the fact that Appellant believes Ri-zan and Rizan’s assistants are hostile to the union and attempt to dissuade new employees from joining the union, for which reason Appellant is resentful of his superiors. Rizan and his assistants categorically deny any intention or attempts on their part to oppose the union.
Equally clear from the record is the fact that Appellant’s employment has been a matter of controversy virtually from the outset. On February 16, 1972, Appellant was reprimanded in writing by John Jennings, Assistant Superintendent, Division of State Buildings, for failure to properly investigate an alleged incident of attempted murder and rape which occurred while Appellant was on duty and for failure to cooperate with local authorities relative to the incident. At this same time Appellant was reprimanded for improperly permitting another officer to leave his post. The letter warned that Appellant must improve in his work or face disciplinary action. On September 21, 1973, Appellant was suspended through September 25, 1973 by Ri-zan for cursing, threatening and offering to fight a fellow officer named Mitchell. This incident occurred at the end of a shift when Appellant was signing out at 6:30 A.M. on the morning of the suspension.
In October, 1972, and again in October, 1973, Rizan rated Appellant for annual salary increases and in each instance disapproved raises because of Appellant’s exhibited poor attitude and resentment of superi- or authority and inclination for loss of self control. Subsequently, apparently because of intervention by higher authority, these disapprovals were rescinded and Appellant received the annual raises involved.
Appellant was evaluated on March 3, 1971, upon request of his superior, Mercy Cambre, in connection with Appellant’s proposed promotion by one grade. The evaluator, Fontaine Abbott, noted that while Appellant had sufficient intelligence for the promotion, Appellant was reputed to be a fault finder and griper. Abbott expressed the opinion that Appellant possessed a “negative attitude” and requested more time to study Appellant’s case.
On or about March 10, or 12, 1975, Appellant submitted to his superiors, through union channels, a list of purported union grievances. The crudely worded and written document in effect accused Rizan of favoritism and partiality in the assignment of overtime work, particularly in favoring supervisory personnel over lower echelon employees. The list contained a grievance entitled, “Better working conditions with Capt. Johnson.” It was alleged that Johnson favored “his boys that rat on his fellow officer.” It is also asserted that while ordinary employees never know what work assignments they will receive on reporting to duty, “Johnson’s rats and pimps know where they are to work.” This particular grievance concludes by admonishing Rizan to “put a stop to Mr. Johnson (sic) babyish ways.” The document further recites that the views expressed “is the men fellings (sic). The moral (sic) is at a all time low.” The document concludes by chiding Rizan for breaking all work rules in the union contract and offering to forgive Ri-zan if Rizan would stop fighting the union and join its members.
Within a day or two of submitting the first list of grievances, Appellant, at Ri-zan’s request to make the issues more specific, submitted a second list which claimed that favoritism was being extended Lt. Gore in regard to overtime work. It was also stated that Rizan had reneged on his promise to avoid placing men on permanent posts or shifts and to work the entire personnel on shifts to afford all employees equal opportunity for both day and night *868 work. Complaint was also made that employees were not allowed to have their uniform ties and jackets cleaned at Employer’s expense as had apparently been agreed as part of the union’s contract. The list clearly states that all of the men feel they are being discriminated against.
Rizan and his assistant, Captain Carlos J. Johnson, suspected that the complaints thus lodged did not represent the views of a substantial number of employees as alleged by Appellant, but rather represented Appellant’s personal feelings. To test their suspicions, Rizan and Johnson called a meeting of all employees to discuss the complaints lodged. The meeting, held prior to Rizan’s March 24, 1975 letter of dismissal, was attended by approximately 30 of the Department’s 35 employees; that is, all except those on duty and also except Appellant who had been suspended effective March 14, 1975. Of those in attendance, approximately one-half or more were union members.
All complaints were placed before the meeting and considered one at a time. After reading and discussing each complaint, a vote of employees was conducted on paper ballots prepared to ascertain the number of employees who supported the complaints or believed them to be true. In each instance a majority of the employees indicated they did not support the charges and not believe them to be true.
A considerable portion of the record consists of Appellant’s attempt to disprove the fairness and accuracy of the balloting. It suffices to state the record indicates beyond doubt that the balloting was handled fairly and without any hint of threat or attempted intimidation of the employees present.
Employer’s rules, a copy of which appears of record, prohibit an employee from using harsh, coarse, profane, insolent, indecent, suggestive, sarcastic or insulting language toward superiors and fellow employees. The rules also proscribe public criticism or ridicule of any official action taken by any member of the Department and the making of any false statement or intentional misrepresentation of fact.
The Commission found that Employer was justified in concluding the complaints were false in that they represented Appellant’s personal views rather than those of all employees as categorically stated in the documents. The Commission also found such action by an employee to be disruptive and, therefore, sufficient ground for removal. We agree with this finding. We find, in addition, that as charged in the letter of dismissal, Appellant’s conduct, as outlined therein, was such as to lessen Appellant’s efficiency as well as that of the entire Department and also was damaging to the morale of the employees in general. We find Appellant was correctly held to have been discharged for cause.
The judgment of the Commission is affirmed, all costs of these proceedings to be paid by Appellant.
Affirmed.